This is an appeal from a decision of the Court of Claims in a Vaccine Act case. Ms. Chen-Kaplan, you want just one minute for rebuttal? Yes, Your Honor. Okay. Go ahead. Thank you. May it please the Court, Sylvia Chen-Kaplan for the Petitioner Appellant. The petitioners are alleging two legal errors. The first is that the lower court and the special master utilized a fact-finding from a proceeding that was not expected to have any precedential value and applied that fact-finding to preclude consideration of the effect of depression on mitochondrial dysfunction and its effect in contribution to the development of autism. And the second legal error that they allege is that the decision was not based on the record as a whole. As this court may be aware, the autism omnibus proceeding was created to deal with 5,000 cases that were filed in the vaccine court. Three test cases of two theories were tried. None of those test cases succeeded. After those test case decisions issued, the court at that time indicated that these test cases were to have no precedential value. The case is moving forward with a different theory. If they had a different theory, the petitioners were allowed to opt out of the OAP. The Andersons opted out. They complied with the procedure that was set forth by the trial court. What's the difference in theory? The difference in theory here, Your Honor, is that at the time of the OAP, mitochondrial autism was unknown. And the test cases at that time alleged that retained measles RNA in both the gut and the brain contributed to the onset of the child's autism, a totally different theory from what was presented in this present case. Mitochondria are cells that provide energy to the body to function. The systems that require the most energy have the most mitochondria and, therefore, are most susceptible to damage. In this particular instance, the The Andersons relate back a lot to the 2008 meeting with Dr. Shofner and Dr. Kendall, who are, say, their metabolic specialists. After the evaluation, those two individuals purportedly recommended whole exome sequencing, genetic testing to determine whether mutations in any of the RNA genes were contributory to their conclusion. Dr. Kendall, I'm quoting, Dr. Kendall found two variants of uncertainty of significance and acknowledged it as purely speculative as to whether or not they are causative for RNA. So two questions. One, was autism diagnosed at that point? No, Your Honor. Autism was diagnosed previously. The contribution of mitochondria to the Given that the 2008 meeting was nearly seven years after the 1999 vaccination edition, on what authority did the doctors note, quote, regression of skills at 17 to 18 months of age, which you cite as authoritative in your brief? To a certain extent, it was based on the testimony of the father. And at that time, it was unknown that mitochondria could lead to autism and lead to a regression of skills in this manner. Subsequent publication What was the other, you say, to a certain extent was based on the statements by the father. What was the rest of it? Well, at that time it was unknown. So the only factual record would have come from the father aside from what was stated to the treating physicians. And the treating physicians not knowing the significance of the symptoms that was being told to them by the parents simply did not record it in their medical records. And thus the absence of contemporaneous findings. You're presupposing that there was a mitochondrial problem here. And yet there was a specific finding by the special master that there was not sufficient evidence that this child was suffering from a mitochondrial problem. And you're also not answering my question. I'm sorry, Your Honor. I asked you on what evidence did the doctors rely and for a regression of skills at 17-18 months. And you said in part the father. And then you said there's an absence. I'm sorry, Your Honor. The parents related the regression of skills at 17-18 months to their treating pediatrician. The treating pediatrician at that time indicated that because the child was a boy that they should wait a few more years to evaluate. They're always slower to develop. I mean, generally. What? But she did make a referral to a developmental evaluation. And at that developmental evaluation the testing revealed that the child's speech and language parameters were at 14-16 months when he in fact was already 23 months. So they indicated that there was a significant delay in the development of those skills. And did Drs. Shoffner and Kendall rely on that? They had the records of the developmental evaluation, yes. And as far as I can tell, based on the evidence, he noted that the loss of skills appeared approximately 17-18 months out. But didn't your own expert actually admit that there really wasn't evidence of regression at that point in time? Yes, he did admit that, Your Honor. However, subsequent publications have indicated that the regression that is seen in children who suffered mitochondrial autism is different from the regression that is seen in typical idiopathic autism. And in fact, Dr. Navio, another metabolic specialist who writes a blog for autism one, indicated that there are at least two different phenotypes. And there's probably more. And as more information is derived, that there will probably be many different phenotypes appearing. Where is that in the record? Where is that in the record? In the appendix, Your Honor. Thank you, Your Honor. I'm sorry, Your Honor, I can't locate it immediately. I'd be glad to provide it to you after this oral argument. But it is definitely in the appendix. Let me just go back to the Snyder issue for a minute. So it's true, though, regardless of what you think they did with Snyder, they did not preclude you from developing the record with respect to your claim that mitochondrial autism is different, right? That is true, Your Honor. And as I read their reference to Snyder, it doesn't say, okay, that was the end of all inquiry with respect to autism, but they just were lying up for the proposition that these vaccines were not generally immunosuppressive. That is true, Your Honor. And doesn't mitochondrial disease and immunosuppression go hand in hand to some extent? They do, Your Honor. However, at the time of the trial of the test cases, the fact that mitochondrial autism could occur was unknown. I agree with that. But if what they're saying is all they're saying is we do know that immunosuppression is not evident from these vaccines, and then later say mitochondrial autism requires some conclusion of immunosuppressant activity, right? The mitochondria are actually present within the immune system as well. So with measles immunosuppression, it causes fever, it causes the development of opportunistic organ infections that could further stress the mitochondria, which includes the mitochondria within the immune system. So what happens is that a cyclical type of problem develops. You get more infections, you get more insult to the mitochondria, including the mitochondria within the immune system, and then you develop more infections, which further compromises the mitochondrial function within both the immune system and the rest of the body. So you're saying even if the vaccines are not immunosuppressive generally, they could be immunosuppressive vis-a-vis the mitochondria that's in the immune system? Yes. And that's what your expert said? Yes. Dr. Hook did indicate that. And with respect to the first question that you asked me, Your Honor, the special master did not answer that question. Well, he found Dr. Hook's heavy reliance on immediate post-vaccination febrile illness at best inconclusive, right? What's your best response to that? That he found that the febrile illness after the immunization was inconclusive? And he found Hook's reliance on it was at best inconclusive. Well, I would suggest to this Court that the evidence was that measles causes immunosuppression within one week after administration of the vaccine. And that immunosuppression continues and hits its lowest point at approximately five weeks. And depending on the antigen that caused the immunosuppression, it could continue up to 10 to 12 weeks. That was the evidence. Now, the fever that occurred, according to even the CDC, fevers can occur in children seven to 12 days after a measles vaccination. It occurs in 5 to 15% of the population. And in this particular instance, the minor here suffered a fever of 105 one week out, which is precisely the time that you would expect to see a fever after measles immunization. So I'm not quite sure how the special master came to that conclusion. Well, I'm looking at 18 and 44 and 45 of the record where the special master explains exactly that. Dr. Hook struggled to identify evidence from the record substantiating it. And then there's a discussion of that. Okay. And Dr. Hook's explanation of what occurred after the measles immunosuppression came to that conclusion is that first the fever occurred of 105 at one week out. Then days later, he was seen in his pediatrician's office with additional fevers and was diagnosed with conjunctivitis. A couple of weeks later, he was again seen in his pediatrician's office and they noted a rash and they noted fever previously. And they also indicated that he had tonsillitis, exudative tonsillitis, which essentially is another infection. And that period of approximately January 28th would be about five weeks after the immunization. And that is the point in which you would expect to see the lowest or the most immunosuppression after measles vaccine. And at that point in time, the vast majority of children, their immune function will start to rise. But depending on the vaccine, it will continue until 10 to 12 weeks after the introduction of the antigen. And we do know that towards the end of this time, approximately March, he was seen again for further infection. That would be roughly at 9 to 10 weeks out. And while the special master did relate this, because he did not consider the testimony on measles immunosuppression, he would not have been able to link the immunosuppression to the child's history. So based on the fact that the special master did not accord this testimony any reliability, he also failed to consider the record as a whole. He failed to consider, he found the respondent's expert more credible, but yet failed to cite instances where his opinion was inopposite to his written articles and was inconsistent and at some point was actually contradicted by some of his own authored articles. And I see my time is up. Thank you. Good morning. May it please the court. I'm Lynn Riccadella, the respondent of the Department of Health and Human Services. Your question is, did the special master weigh in favor of vaccine causation? He did exactly what the vaccine act required him to do and he looked at the record as a whole and he concluded that respondent's expert, Dr. Cohen, was simply the more persuasive expert in this case. That Dr. Cohen was far more experienced in terms of mitochondrial diseases and disorders and that frankly, the special master said this was not a close case. I mean, the reference to Snyder, while I think you make a good argument that, well, he still went back and allowed the information, it does seem to be a prejudice. It does seem to be the attitude of, look, we looked at autism and, you know, any kind of autism is never going to fall within that. With all due respect, that's not why he cited Snyder in this case. He's not saying that we looked at autism and therefore any autism that comes down the pike after that is going to be precluded. He looked at it specifically for the issue of whether or not the measles vaccine itself is immunosuppressive. And we heard some testimony from Mr. McCathlin just now about the alleged immunosuppressive effect of MMR. I'm going to refer the court to really the extent of the evidence on immunosuppression of MMR. It is one sentence in Dr. Hook's expert report, which unfortunately doesn't seem to be in the appendix, but if I may proffer to the court what he said. One sentence in Dr. Hook's expert report. One sentence. The combination of MMR immunosuppression along with the deficient immune response more probably than not contributed to the frequent infections that followed his vaccination. And that's Exhibit 29 at 2. That's it. And then after that sentence he had a parenthetical with three articles that he filed. Those are the Munyer, the Smedman, and the Hussey articles. No discussion of those articles whatsoever. We get to trial. And I will direct the court's attention to the extent of the evidence in the trial about the alleged immunosuppressive effect of the vaccine. It's Appendix 349 through 40. Transcript page numbers 140 through 142. Dr. Hook just talks about the alleged immunosuppressive effect of the vaccine in broad brush strokes. And to be fair to him, he's not an immunologist. He doesn't have the requisite credentials to talk about whether or not the vaccine was immunosuppressive. It seems like the special master said that unless they actually prove regression, that somehow there's not going to be any ability to show that this condition existed. Why was that required? I'm sorry. Which condition are you talking about? The autism? The mitochondrial. First of all, I would like to correct the record that there's no such thing as mitochondrial autism. I know the petitioners use that in their brief. And that is not a recognized term of art in the medical community, in the mitochondrial community specifically. Whether or not mitochondrial disease causes autism is still being explored, but it is by no means shown. And Dr. Cohen was very, very straightforward and very persuasive on that issue. No, the special master didn't say that unless they show regression that they're out. We've had other cases in the program where the petitioners do, their child has regressed, and they still haven't been able to show that the vaccination caused an aggravated mitochondrial disorder to show autism, because the evidence just simply isn't there to show that vaccines can aggravate mitochondrial disorders, regression or not. But in this case, all the evidence that the petitioners relied on, that Dr. Huck relied on, had to do with regression, with developmental regression. But even he, at trial, now it's important, up until trial, he kept saying this child regressed. But at trial, he acknowledged that the evidence simply didn't support the allegation that the child in this case regressed. But did he say that there isn't current evidence of regression versus there wasn't some regression earlier that he has recovered from? No, and if you look at the special master went through a very detailed description of the medical records that he cited each time the child went to the pediatrician, and there's no evidence of regression. In fact, when the child eventually did get to be seen by a developmental specialist, both of those specialists made a note in their notes that there is no evidence of regression here. So at no time did any medical provider diagnose this child with regression, except for Drs. Bradstreet and Drs. Rossengall, but they are medical providers who espouse the fact that vaccines can cause autism, which is why when Dr. Schaffner saw the child eight years later, he based in part his diagnosis of mitochondrial disease on an incorrect factual predicate that the child had regressed at 17 to 18 months. But if you actually look at the medical records, the child did not regress at 17 to 18 months, and even their own expert acknowledged that there was no evidence of regression. So Drs. Bradstreet and Drs. Rossengall did not have any evidence of regression. And I think it's quite telling that her first answer to you was the father's testimony. It's anecdotal testimony. Mr. Anderson obviously loves his child and believes there is a certain sort of clinical course, but if you look at the contemporaneous medical records, and as this court said in the case, it's not known whether the child has regressed. It's not like the doctor is living with them. Well, the doctors, the developmental specialists who specifically are trained in asking the appropriate questions of parents, what is regression, what is not regression, both of the developmental specialists who looked at this child specifically made mention that there was no evidence of regression in this case. And if you just look at the medical records, Your Honor, they just do not bear out that the child lost any skills. They never say that he had a certain amount of words and then lost them that we typically see in cases where there is evidence of regression. This record is simply devoid of evidence of any kind of developmental regression. The problem was, though, back in 2000, the doctors weren't actually looking for regression, right? I'm sorry? They weren't really looking for regression. They certainly were. Absolutely. The developmental specialists, absolutely, Your Honor. That's true. Within their ambit, they certainly were. Correct. Absolutely. And if I just may get back to the citation to Snyder, if you look at the citation to Snyder, the special master just didn't give sort of one page with a parent's medical. He cited to three pages where the special master in that case went through a very detailed discussion of the evidence that was put before the court and the OAP, both from the petitioners and the respondent, as to the alleged immunosuppressive effect of the vaccine. And the special master didn't just have to cite to Snyder. There were two other test cases on that theory. And both of the other special masters in those two test cases came to the same conclusion with respect to that issue. It's as if the special master never said that he was bound by any of the test case decisions. He cited to Snyder simply as he would to any other case, as we all do when we cite to cases that are not necessarily presidential, but are definitely persuasive. And he said, given the very limited evidence that Dr. Huck put before me on this issue, particularly in light of the fact that this issue was discussed ad nauseum in the OAP, I simply am not persuaded that the vaccine itself is immunosuppressive. This case rises and falls purely on a question of evidence in an evidentiary way. Yes, Your Honor, that's correct. And this case rises and falls. As the special master said, the central deficiency in this case is the finding that the child didn't have a mitochondrial disorder. Absent that, I mean, the case really falls, really, it can be closed there. He said, you know, for purposes of completeness, in the interest of just being as thorough as possible, he then went ahead and annualized the case under the three L's and prongs. He didn't have to do that. But he said that not only the case has multiple evidentiary problems, not just the fact that the child doesn't have a mitochondrial disorder. Any other questions? Thank you. Okay. You have 36 seconds for rebuttal. Thank you. Your Honor, the Navio citation is at appendix 252 to 257. And I would direct you to appendix 254 where it indicates the flare and fade response. And it says, follow a flare response that can be a gradual evolution of other problems from persistent GI problems and diarrhea, a gradual loss of language over two to three months with the onset of repetitive movements to gaze-avoidance and social avoidance. This is exactly what happened to the minor Anderson here. Your Honor, also, the decision that this child did not have a mitochondrial disorder was based on the weight of the evidence that the special master accorded to the respondent's expert. However, his expert testimony was contradicted, virtually inconsistent with his published articles, which the special master did not comment upon. Therefore, if he had considered the record as a whole, would he have accorded greater weight to this testimony when, in fact, it was being contradicted by his own authored articles? And that's Petitioner's position on the fact that he did not consider the record as a whole. Okay. Your time is up. I have one more question. Restate. Okay. Thank you.